U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 DEC -8 PM 4:34

CLERK

BY_____ HBe
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

CHARLES GORDON, ALICIA GORDON, )
D.J. ENTERPRISES LLC, )
A.C. LAWN MOWING, )
DENIELLE GORDON, individually and )
doing business as DEN & COMPANY )
)
      Plaintiffs, )
)
v. )   Case No. 2:17-cv-00154
)
NEW ENGLAND CENTRAL )
RAILROAD, INC., )
)
      Defendant. )

**OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR
A PRELIMINARY INJUNCTION**
(Doc. 2)

    Plaintiffs, Charles, Alicia, and Denielle Gordon (the "Gordons"), D.J. Enterprises LLC, and A.C. Lawn Mowing, (collectively, "Plaintiffs") bring this action against Defendant New England Central Railroad, Inc. ("NECR"), alleging that NECR was negligent in its repair of a raised railroad right of way embankment (the "embankment") adjacent to the Gordons' land located at 68 Old River Road in Hartford, Vermont (the "property") after a July 1, 2017 landslide. Plaintiffs further allege that NECR is engaged in ongoing trespass on the property as a result of this repair.

    Pending before the court is Plaintiffs' motion for a preliminary injunction (Doc. 2) seeking an order enjoining NECR from trespassing on the Gordons' property and requiring it to remove materials allegedly deposited on the property after the landslide. Although Plaintiffs initially requested an order that required NECR to repair the

embankment in a manner that will prevent further trespass onto the property, they have withdrawn that request.

On September 22, 2017, the court held an evidentiary hearing on the pending motion at which NECR asserted that Plaintiffs' state law claims are preempted by the federal Interstate Commerce Commission Termination Act (the "ICCTA"), 49 U.S.C. §§ 10101-11908, and the Federal Railway Safety Act (the "FRSA"), 49 U.S.C. §§ 20101-21311. At the conclusion of the hearing, the court granted Plaintiffs' request to provide supplemental briefing on the preemption issues which the parties completed on November 1, 2017. Plaintiffs are represented by R. Bradley Fawley, Esq. and Timothy C. Doherty, Jr., Esq. NECR is represented by Michael B. Flynn, Esq. and Matthew M. Cianflone, Esq.

I.  **Findings of Fact.**

For the purposes of the pending motion, based upon the admissible evidence, the court makes the following findings of fact by a preponderance of the evidence:

   A.  **The Parties and the Property.**

1. The owners of the property, Plaintiffs Charles and Alicia Gordon, are married and the parents of Plaintiff Denielle Gordon, an adult woman who owns a beauty salon. The Gordons do not live at the property.
2. A.C. Lawn Mowing and D.J. Enterprises LLC are businesses operated by the Gordons, with headquarters at 136 Beech Street in White River Junction, Vermont.
3. NECR is a Delaware corporation with a principal office in Rochester, New York. It owns a permanent easement and right of way on the embankment, approximately thirty feet above the property. NECR operates freight trains along its railroad tracks on the right of way and provides access to its tracks to Amtrak for its twice-daily rail passenger service in Vermont.
4. The property is located immediately adjacent to NECR's right of way at mile marker 16.25 on the Roxbury subdivision. It consists of approximately .74 acres bounded to the south by NECR's right of way on the embankment and to the north by Old River Road in Hartford, Vermont.
5. The Gordons' deed to the property does not contain a metes and bounds description.

6. The property includes three buildings which formerly served several purposes: Charles Gordon stored tools, machinery, and equipment for his commercial sweeping and bark mulch topsoil businesses in the garage; Denielle Gordon operated her beauty salon in a second floor area; several garage bays were rented to contractors for equipment storage; one portion of the property was rented to a "therapeutic program for disabled children," (Tr. at 115); another portion was rented to a distributor that sells coffee, tea, honey, and maple syrup; and the Gordons rented an apartment on the second floor to a non-family member tenant.

7. In 1991, the property's boundaries were surveyed by Roy G. Hathorn, a licensed surveyor, for the benefit of the property's prior owners (the "'91 Survey"). On October 3, 1991, C.D. Holzwarth prepared a corresponding map reflecting the '91 Survey.

8. Joseph Nalette is a licensed land surveyor who assisted Mr. Hathorn with the field work for the '91 Survey prior to obtaining his surveyor's license. Mr. Nalette is qualified as an expert witness in the field of land surveying. The court found Mr. Nalette's testimony credible and persuasive.

9. Mr. Nalette determined the property's boundaries by comparing the railroad's 1917 valuation map with the physical location of the rail line, and measuring the distance from the center of the rail line and the center of a highway to establish a corner of the Gordons' property. He then measured distances from "stationing" points along the rail line to determine the length of the boundary between the right of way and the property. He was unable to locate metal pins demarcating the Gordons' property line placed as part of the '91 Survey.

10. Mr. Nalette explained that he discounted the boundaries indicated on a plan prepared by Robert Farnsworth (the "Farnsworth Plan") sometime after the '91 Survey was completed. In particular, Mr. Nalette noted that the Farnsworth Plan's drawing of the property line diverged from the railroad's own 1917 valuation map.

11. NECR did not introduce its own survey. It proffered no plausible challenge to the accuracy of the '91 Survey.

   **B.   The July 2017 Historic Rain Event.**

12. On July 1, 2017, White River Junction, Vermont experienced a "250-year [rainfall] event by meteorological standards." (Tr. at 27.) As a result of this historic rain event, NECR's tracks on the embankment were "washed out in two significant locations in the area of [mile marker] 16.25[.]" (Tr. at 161.) The washout caused the tracks to be suspended in the air with no support beneath them. Because this damage rendered NECR's tracks non-compliant with federal railroad safety regulations, NECR was forced to suspend operations on its right of way until repairs could be made. As a result of NECR's suspension of operations, Amtrak passenger trains that typically use NECR's right of way were cancelled for

a period of "[a]pproximately four to five days." (Tr. at 165.) NECR paid Amtrak compensation during the days the rail line was out of service.

13. The washout of the embankment generated a landslide of dirt, rocks, and foliage which caused significant damage to buildings located on the property, including: caving in a building's back wall; pushing a vehicle parked in a garage bay through the bay door; filling several garage bays with mud, silt, and water; and destroying the interior shelving and furniture in Denielle Gordon's beauty salon. The Gordons "cleaned 25 loads of debris out of" the garage bays after the event. (Tr. 121.)

14. Because of the landslide, the apartment the Gordons were renting is no longer habitable and their tenant has relocated.

15. Also because of the landslide, Mr. Gordon cannot use the garage bays in which he previously stored tools and equipment because the power, propane, and water were turned off as a result of damage to the building. His businesses are still operating, "[b]ut not at a hundred percent." (Tr. at 135.)

16. Of the eight tenants using space in buildings on the property prior to the July 2017 rain event, three remain. Several tenants have been unable to recover items that are "still buried in the mud[.]" (Tr. at 140.)

### C. The Repair of the Embankment and the Implications of Removing the Rip-Rap Rock.

17. To repair the damage to the right of way, NECR contracted with two engineering firms that recommended that NECR use "rock material for better drainage and suitable subgrade to support the structure of the track." (Tr. at 173.) A long-reach excavator removed loam and the sandy subgrade on the embankment, and rip-rap rock was installed in its place.

18. To determine the boundary of its property during repair of the embankment, NECR did not obtain a survey or consult with a licensed surveyor. Instead, it consulted its own valuation maps to determine the property line using a wall depicted on its plans which it believed marked the boundary between the right of way and the property. NECR's Director of Engineering, Rick T. Boucher, testified that the wall had a two-foot vertical exposure and was approximately 50 feet in length horizontally. In contrast, John P. Mayo, a roadmaster and track inspector for NECR, testified that the wall used to define the boundary was approximately four to five feet long. He testified that he was uncertain whether anyone measured the property line prior to the embankment's repair. The wall is only visible in a small area in light of the placement of the rip-rap rocks.

19. NECR "used [the wall] as a guideline to repair[] [and] reestablish the toe of [the] slope." (Tr. at 174.) Mr. Boucher explained that NECR rebuilt the slope of the embankment in its prior location "[t]o the best of what we could do[.]" (Tr. at

4

177.) The repair brought the tracks back into compliance with federal railway safety regulations and rail traffic resumed.

20. The parties agree that prior to the landslide, the embankment had undulating contours and a varied pitch slope that was covered by foliage, which has been altered by NECR's repair.

21. Mr. Boucher credibly opined that the rebuilt slope is "less steep[,]" which he considers "an improvement[.]" *Id.*

22. As part of his survey in anticipation of this litigation, Mr. Nalette measured the extent of the newly placed rip-rap rocks and determined that a portion of them extend onto the southern edge of the property. Mr. Nalette depicted the extent of the rip-rap rock on an annotated version of the '91 Survey, admitted in evidence as Plaintiffs' Exhibit 3.

23. A portion of rip-rap rock, marked as pile "A" on Plaintiffs' Exhibit 3a, lies wholly within the property but predates the July 2017 rain event. It was placed by the railroad with Mr. Gordon's consent in an effort to stabilize a drainage culvert. Plaintiffs represent that they "are not pursuing pile A . . . for the injunction." (Tr. at 223.)

24. Mr. Gordon credibly testified that rip-rap rock is "still . . . rolling, some of it, into [his] shop" and that "[e]very now and then [he does] find a stone after a rainstorm or something that – different sized stones roll off the bank and right into [his] [garage] bay there." (Tr. at 126.) Mr. Gordon is no longer "comfortable working in that bay[.]" *Id.*

25. Mr. Gordon also explained that the rip-rap rock makes it "impossible" to access an area "a little bit wider than a wheelbarrow" between the rear of his buildings and the embankment, which he previously used to maintain the property and clear fallen snow. (Tr. at 129-30.)

26. Removal of the rip-rap rock from the property would cost NECR approximately $150,000 and may take the right of way out of service for approximately three to four days, resulting in the suspension of rail service. Mr. Boucher opined that this type of repair would have "a direct impact . . . on the railroad and its revenue," as well as a possible indirect impact "on surrounding communities, [because] the customer [would be] paying higher rates[.]" (Tr. at 169.)

27. With regard to whether removal of the rip-rap rock would necessitate a suspension of railroad operations, Mr. Boucher conceded that it might not:

> Q: So properly engineered, do you agree or disagree that a retaining wall could be constructed on the railroad property to hold back the embankment?
>
> A: Yes, it could.

5

> Q: All right. And that retaining wall would comply with federal regulations, right?
>
> A: Designed properly, correct.
>
> Q: All right. And it would just be more costly for the railroad to accomplish that than using Mr. Gordon's property, correct?
>
> A: It would be more costly to install the wall.
>
> Q: Right. Now, you say it will disrupt traffic on the railway, but isn't it true that there are spaces of six, seven hours between trains that equipment could be used to be installing this retaining wall?
>
> A: You would jeopardize the integrity – those small work windows would not be enough time frame to make that application and maintain the integrity of the slope.
>
> Q: You are telling me that you can't drive pilings into the slope made out of steel that will hold back the wall and then build the wall while train traffic is intermittently going back and forth?
>
> A: There's been no soil samples or anything taken to prove that that would be a reliable way to approach it.
>
> Q: That's a possible option, right?
>
> A: It may be.

(Tr. at 197-98.)

28. Mr. Boucher acknowledged that NECR occasionally purchases property needed for infrastructure projects.

## II. Conclusions of Law and Analysis.

### A. Whether Plaintiffs' Common Law Trespass Claims are Preempted by the ICCTA.

Plaintiffs' Verified Complaint alleges two causes of action: common law trespass and common law negligence. The court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. As a result, the outcome of Plaintiffs' substantive claims is governed by Vermont law. *See McCarthy v. Olin Corp.*, 119 F.3d 148, 153 (2d Cir. 1997) ("A federal court sitting in a diversity case will apply the substantive law of the forum state on outcome determinative issues") (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).

6

Under § 158 of the Restatement (Second) of Torts, which the Vermont Supreme Court has adopted, a trespass occurs whenever one "enters or causes a thing to enter the land of another." *Canton v. Graniteville Fire Dist. No. 4*, 762 A.2d 808, 810 (Vt. 2000); *Harris v. Carbonneau*, 685 A.2d 296, 299 (Vt. 1996). "[An] actor, without himself entering the land, may invade another's interest in its exclusive possession by throwing, propelling, or placing a thing either on or beneath the surface of the land or in the air space above it." RESTATEMENT (SECOND) OF TORTS § 158 cmt. i. (1965).

NECR contends that the Surface Transportation Board ("STB"), an administrative review board established by the ICCTA, has exclusive jurisdiction over this suit and asks the court to hold that Plaintiffs' trespass claim is preempted. Passed by Congress in 1996, the ICCTA abolished the Interstate Commerce Commission and replaced it with the STB. The ICCTA was intended to avoid "the balkanization and subversion" of nation-wide railway regulations. *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 102 (2d Cir. 2009) (quoting *Iowa, Chi. & E. R.R. Corp. v. Wash. Cty.*, 384 F.3d 557, 559 (8th Cir. 2004)). To further this intent, the ICCTA contains the following preemption clause:

> The jurisdiction of the Board over—
>
>> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>>
>> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive. Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b). "Transportation" is defined as:

> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

7

(B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property[.]

49 U.S.C. § 10102(9).

Under the Supremacy Clause of the United States Constitution, "[w]here a state statute conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993). In this case, NECR alleges both express and implied preemption under the ICCTA. Express preemption occurs when a federal statute directly forecloses competing state law through its plain text. *See Cipollone v. Ligget Grp., Inc.*, 505 U.S. 504, 517 (1992) (express preemption occurs "[w]hen Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue"). Implied preemption may "be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." *Island Park*, 559 F.3d at 101 (internal quotation marks omitted). "[T]he party asserting that federal law preempts state law bears the burden of establishing preemption." *In re Methyl Tertiary Butyl Ether Prods. ("MBTE") Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013) (citing *Wyeth v. Levine*, 555 U.S. 555, 569 (2009)).

1. **Express Preemption.**

"If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Easterwood*, 507 U.S. at 664; *see also Island Park*, 559 F.3d at 101 ("Congressional intent 'primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it.'") (quoting *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 641 (2d Cir. 2005)).

> "In the interest of avoiding unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption. Thus, pre-emption will not lie unless it is 'the clear and manifest purpose of Congress.'"

8

*Easterwood*, 507 U.S. at 663-64 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Even "[i]f a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). As one Circuit Court of Appeals has observed, "the presumption against preemption is applicable to 'areas of law traditionally reserved to the states, like police powers and property law[.]'" *Franks Inv. Co. v. Union Pac. R.R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010) (en banc) (quoting *Davis v. Davis (In re Davis)*, 170 F.3d 475, 481 (5th Cir. 1999) (en banc)); *see also Island Park*, 559 F.3d at 101 ("Indeed, when courts are called upon to address questions of express or implied pre-emption, the analysis always begins with the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.") (internal quotation marks and alterations omitted).

In *Island Park*, the Second Circuit examined the scope of ICCTA preemption over state regulatory claims in the context of a request for an injunction to prevent the closure of a private railroad crossing. An administrative law judge found the private crossing gave rise to several safety concerns and the New York State Department of Transportation issued a closure order. The plaintiffs argued that the state's decision violated the express preemption provisions of the ICCTA and the FRSA by encroaching on federal authority to regulate rail transportation and railroad safety standards. The district court, in turn, found that the ICCTA preempted the state's closure order because the order attempted to regulate rail transportation.

Reversing the district court's decision, the Second Circuit observed that "all state laws that may reasonably be said to have the effect of managing or governing rail transportation" are preempted. *Island Park*, 559 F.3d at 102 (internal quotation marks omitted). However, that does not foreclose the application of state laws that have "a more remote or incidental effect on rail transportation." *Id.* (internal quotation marks omitted). Because the preemption inquiry "focuses on the degree to which the challenged

9

regulation burdens rail transportation," notwithstanding the ICCTA's expansive definition of "rail transportation[,]" the Second Circuit found that although the term "does include property . . . related to the movement of passengers or property by rail," the closure of a private rail crossing did "not 'relate to' 'the movement of passengers or property . . . by rail.'" *Id.* at 103-04 (internal quotation marks omitted) (quoting 49 U.S.C. § 10102(9)(A)). Accordingly, the Circuit vacated the district court's order to the extent that it relied on ICCTA preemption. *See id.* at 110 ("The exercise of state authority to close the rail crossing at issue pursuant to N.Y. Railroad Law § 97(3) is not pre-empted under ICCTA or FRSA.").

In concluding that ICCTA preemption did not apply in *Island Park*, the Second Circuit distinguished its decision in *Green Mountain Railroad Corp. v. Vermont*, 404 F.3d 638 (2d Cir. 2005). There, the Second Circuit found ICCTA preemption where a Vermont environmental permitting regulation blocked the development of a transshipping facility along the Connecticut River. In doing so, the Circuit pointed out that not all state law is preempted:

> [S]tates and towns may exercise traditional police powers over the development of railroad property, at least to the extent that the regulations protect public health and safety, are settled and defined, can be obeyed with reasonable certainty, entail no extended or open-ended delays, and can be approved (or rejected) without the exercise of discretion on subjective questions.

*Green Mountain R.R.*, 404 F.3d at 643. Because the state environmental regulation in question was discretionary, did not include objective schedules or standards for its applicability, and would give rise to lengthy delays for administrative determinations, the Second Circuit concluded that the regulation directly burdened the railroad's operations. *See id.* ("We need not draw a line that divides local regulations between those that are preempted and those that are not, because in this case preemption is clear[.]"). In contrast, in *Island Park*, no such burden was found. *See* 559 F.3d at 102-03.

Application of the Second Circuit's precedent to this case reveals that Plaintiffs have established that NECR is engaged in an ongoing trespass on their property and no

10

plausible interpretation of the term "transportation" includes this type of tort. For this reason, they contend NECR was not and is not engaged in "transportation by rail carrier" as required by 49 U.S.C. § 10501(b)(1) when it placed and refused to remove the rip-rap rocks on the property.

NECR counters that Plaintiffs' trespass claim is expressly preempted by the ICCTA's plain language establishing exclusive STB jurisdiction over "transportation by rail carriers," 49 U.S.C. § 10501(b), and that preemption confers upon the STB "exclusive jurisdiction over *all issues affecting* rail transportation and/or operations[.]" (Doc. 11 at 6.)[1] Because Plaintiffs' proposed remedy may destabilize the repaired embankment and result in the suspension of rail operations, NECR contends it is squarely preempted.

To determine whether the ICCTA preempts Plaintiffs' narrowed trespass claim, "[t]he appropriate questions are: what does the state [law] seek to regulate and does the [law] burden rail transportation?" *Island Park*, 559 F.3d at 103; *see also Franks*, 593 F.3d at 414 ("The relevant question under the ICCTA is whether [the] dispute invokes laws that have the effect of managing or governing, and not merely incidentally affecting, rail transportation."). Because the ICCTA broadly defines "rail transportation" to include any "property[] . . . related to the movement of passengers or property by rail," 49 U.S.C. § 10102(9)(A), Plaintiffs' narrowed trespass claim presents a close question.

A trespass claim generally "does not seek to impose its authority over the tracks themselves[,]" nor does it have "the effect of managing or governing rail transportation[.]" *Island Park*, 559 F.3d at 102-03; *see also Emerson v. Kan. City S. Ry. Co.*, 503 F.3d 1126, 1130 (10th Cir 2007) (declining to find express preemption where plaintiffs alleged "possibly tortious acts committed by a landowner who happens to be a railroad company"). Removing the rip-rap rock on the property may burden NECR, but

---

[1] NECR's statement of the law sweeps too broadly. It is not enough to "affect" rail transportation and/or operations: "For a state court action to be expressly preempted under the ICCTA, it must seek to regulate the operations of rail transportation." *Franks Inv. Co. v. Union Pac. R.R. Co.*, 593 F.3d 404, 413 (5th Cir. 2010) (en banc).

NECR failed to establish that it will *necessarily* burden "the movement of passengers or property by rail[.]" 49 U.S.C. § 10102(9)(A). NECR's representative conceded that it may be possible to remove the rip-rap rocks without a suspension of rail operations. Based on the record before the court, Plaintiffs' continuing trespass claim is therefore not clearly within the scope of express ICCTA preemption. *See Island Park*, 559 F.3d at 104 ("We think it important to emphasize that although ICCTA's pre-emption language is unquestionably broad, it does not categorically sweep up all state regulation that touches upon railroads-interference with rail transportation must always be demonstrated"). NECR has failed to sustain its burden to show express preemption.

### 2. Implied Preemption.

To the extent that the court rejects express preemption, NECR urges it to find implied preemption because the ICCTA's broad language reflects a congressional intent for federal law to occupy the field of railroad operations with which Vermont trespass law would interfere. Implied preemption may "be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." *Id.* at 101 (internal quotation marks omitted).

In determining whether implied preemption exists, Circuit Courts of Appeals have adopted the STB's own two-pronged "as applied" test.[2] Pursuant to this test, a state law is not preempted if: "(1) it is not unreasonably burdensome, and (2) it does not discriminate against railroads." *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 253 (3d Cir. 2007). Although the Second Circuit has not determined whether it will adopt the STB's two-pronged "as applied" test, in *Green Mountain Railroad*, it noted that "[a]s the agency authorized by Congress to administer the [ICCTA], the [STB] is

---

[2] *See Franks*, 593 F.3d at 414 ("We adopt the STB's as-applied preemption analysis as appropriate for implied preemption under the ICCTA."); *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 253 (3d Cir. 2007) ("Thus, according to the Board, state regulation is permissible if it passes a two-part test: (1) it is not unreasonably burdensome, and (2) it does not discriminate against railroads").

12

uniquely qualified to determine whether state law should be preempted by [the ICCTA]." 404 F.3d at 642 (internal alterations and quotation marks omitted).

With regard to the first prong of the STB's test, NECR has not established that Plaintiffs' narrowed request for injunctive relief will be unreasonably burdensome. Although removing the rip-rap rock will have *some* impact on NECR's operations because it will cost an estimated $150,000, with regard to other impacts NECR's witnesses testified either vaguely or inconsistently. For example, on direct examination, Mr. Boucher opined that removing the rip-rap rock in the toe of the embankment would take the rail line out of service for an estimated "three, four days[,]" disrupting the shipment of commodities and forcing passenger service to "shut down[,]" so that passengers "would [have to] take the bus." (Tr. at 167.) On cross examination, however, he acknowledged that it "may be" possible to build a retaining wall to stabilize the slope during the six to seven hour periods between trains, without taking the line out-of-service. (Tr. at 198.)

The cost of remedying tortious conduct is generally not determinative of implied preemption. *See New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F.3d 321, 335 (5th Cir. 2008) (expressing "doubt whether increased operating costs are alone sufficient to establish unreasonable interference with railroad operations.") (internal quotation marks omitted). Consequently, a state's trespass law is generally not deemed in conflict with federal law governing railroads. *Cities of Auburn & Kent, WA* is instructive. There, the STB held that:

> [T]here are areas with respect to railroad activity that are reasonably within the local authorities' jurisdiction under the Constitution . . . . [A] local law prohibiting the railroad from dumping excavated earth into local waterways would appear to be a reasonable exercise of local police power . . . . The railroad also could be required to bear the cost of disposing of the waste from the construction in a way that did not harm the health or well being of the local community.

13

2 S.T.B. 330, 1997 WL 362017, at *6 (1997).[3] As Plaintiffs observe, NECR's position to the contrary would "ha[ve] no obvious limit[.] . . . If the ICCTA preempts a claim stemming from improperly dumped railroad ties, it is not a stretch to say that the Railroad could dispose of a dilapidated engine in the middle of Main Street-a cheap way to be rid of an unwanted rail car." *Emerson*, 503 F.3d at 1132. Protection of Plaintiffs' property rights under state law may cost NECR time and money, but will not inevitably impose "unreasonabl[e] burden[s]" on rail transportation. *Island Park*, 559 F.3d at 105.

With regard to the second prong of the STB's test, Vermont's well-established trespass law is facially neutral law that does not discriminate against NECR or railroads in general.

> [T]he ICCTA does not expressly preempt the generally applicable state common law[.] . . . State tort law obviously has no pre-approval component, as it necessarily addresses wrongs that have already occurred; and if the Landowners prevail on remand, the applicable remedy under state law would not deny the Railroad the ability to operate or to proceed with an STB-approved activity.

---

[3] NECR's cited authority is inapposite. For example, in *Waubay Lake Farmers Ass'n v. BNSF Ry. Co.*, 2014 WL 4287086, at *3 (D. S.D. Aug. 28, 2014), the plaintiffs sought "'specific relief requiring [BNSF] to construct its roadbed to conform to and allow for natural drainage.'" In other words, the plaintiffs sought a court order directing the railroad to make alterations to its own property, including the roadbed underlying the tracks themselves. Similarly, in *Jones Creek Inv'rs, LLC v. Columbia Cty., Ga.*, 98 F. Supp. 3d 1279 (S.D. Ga. 2015), the plaintiffs brought tort claims alleging damages as a result of the railroad's replacement of an upstream culvert on its own property that "was an integral and necessary repair to the railway infrastructure." *Id.* at 1294. Likewise, in *Pere Marquette Hotel Partners, LLC v. United States*, 2010 WL 925297, at *4 (E.D. La. Mar. 10, 2010), the plaintiffs alleged injuries flowing from "the negligent design and construction of roadbeds and other areas of track[,]" not trespass by the railroad on their property. Finally, in *Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141, 1144-45 (8th Cir. 2015), the plaintiffs sought direct appellate review of an STB decision, and the Eighth Circuit subsequently applied a "'quite narrow'" standard of review that asked only whether the STB's decision was "based on a permissible construction of the statute" and whether its finding of preemption was "supported by substantial evidence" and "reasonable inferences[.]" To the extent that the *Tubbs* court considered the appropriate test for implied preemption under the ICCTA, it approved of the STB's two-part "as applied" test and concluded that the STB's finding of preemption for claims "based on alleged harms stemming directly from the actions of a rail carrier, BNSF, in designing, constructing, and maintaining an active rail line" was appropriate. *See id.* at 1146 (internal quotation marks omitted). None of these cases hold that preemption extends to a railroad's trespass on non-railroad property.

*Emerson*, 503 F.3d at 1130-31; *see also Green Mountain R.R.*, 404 F.3d at 643 (observing that state laws "enacted for the protection of the public health and safety, and other generally applicable, non-discriminatory regulations . . . would seem to withstand preemption").

For the foregoing reasons, although a close question, on the limited record before the court, NECR has failed to establish that requiring it to remove the trespassing material on the Gordons' property will have a more than "incidental effect on rail transportation" and will "impose . . . authority over the tracks themselves[.]" *Island Park*, 559 F.3d at 102-03 (internal quotation marks omitted). For the purposes of the pending motion, it has thus failed to establish that either express or implied preemption applies.

### B. Whether Plaintiffs' Common Law Trespass Claims are Preempted by the FRSA.

NECR asserts that Plaintiffs' narrowed request for preliminary injunctive relief is barred by the FRSA, a federal statute establishing a comprehensive regulatory scheme for railroad safety. "FRSA provides the appropriate basis for analyzing whether a state law, regulation or order affecting rail safety is pre-empted by federal law." *Island Park*, 559 F.3d at 107. Only state laws "covering the same subject matter" as FRSA regulations are preempted by the statute's preemption clause. *Easterwood*, 507 U.S. at 664. The Supreme Court has held that a federal regulation covers the same subject as state law when it "substantially subsume[s] the subject matter of the relevant state law." *Id.* In 2007, Congress amended the FRSA's preemption clause to exclude state law claims for property damage which allege that a party "failed to comply with the Federal standard of care established by a regulation . . . covering the subject matter[,]" or a state law claim alleging a violation of state law that "is not incompatible" with a federal regulation. Pub. L. 110-53 (121 Stat. 453) (Aug. 3, 2007).

Plaintiffs' narrowed request for injunctive relief does not ask that NECR be ordered to rebuild the embankment. It seeks only to have the trespassing rip-rap rock removed. An order directing NECR to remove the rocks would thus leave it free to

comply with safety regulations in any way it saw fit. The FRSA therefore does not "substantially subsume" Plaintiffs' continuing trespass claim and it is not preempted by the FRSA. *Easterwood*, 507 U.S. at 664.

### C. Whether Plaintiffs Are Entitled to Preliminary Injunctive Relief.

#### 1. Standard of Review.

"A preliminary injunction is an extraordinary remedy never awarded as of right. In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'" *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (quoting *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)) (internal citation omitted). "A party seeking a preliminary injunction must generally show a likelihood of success on the merits, a likelihood of irreparable harm in the absence of preliminary relief, that the balance of equities tips in the party's favor, and that an injunction is in the public interest." *Am. Civil Liberties Union v. Clapper*, 804 F.3d 617, 622 (2d Cir. 2015); *see also New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 193 (2d Cir. 2001) (acknowledging standard applies to trespass claim).

Where the moving party does not seek injunctive relief against a government entity acting in the public interest, an injunction may also issue where the party can establish "sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (internal quotation marks omitted).

#### 2. Whether Plaintiffs Established A Substantial Likelihood of Success on the Merits.

Under Vermont law, a trespass occurs whenever one "enters or causes a thing to enter the land of another." *Canton*, 762 A.2d at 810. NECR intentionally placed rip-rap rock on the property. Although the area in question is relatively small, NECR has proffered no credible evidence to the contrary. The Gordons have therefore shown a

16

substantial "likelihood of success on the merits" of their narrowed trespass claim at trial. *Clapper*, 804 F.3d at 622.

### 3. Whether Plaintiffs Have Shown Irreparable Harm.

"To establish irreparable harm, a party seeking preliminary injunctive relief must show that 'there is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation.'" *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *N.Y. Pathological & X-Ray Labs., Inc. v. INS*, 523 F.2d 79, 81 (2d Cir. 1975)). "A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" *Faiveley Trans. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). The Second Circuit has directed district courts to "determine irreparable injury by considering what adverse factual consequences the plaintiff apprehends if an injunction is not issued, and then considering whether the infliction of those consequences is likely to violate any of the plaintiff's rights." *Time Warner Cable v. Bloomberg L.P. of N.Y.C.*, 118 F.3d 917, 924 (2d Cir. 1997).

Plaintiffs assert that NECR's placement of the rip-rap rock limits their use of the property for their business and personal pursuits, and restricts their access and ability to maintain their buildings.[4] Although they proffer ample evidence in support of the disruptive impacts of the landslide, they present less compelling evidence of the disruptive impact of NECR's continuing trespass. For example, they do not contend that they cannot engage in their businesses because of the rocks, only that with respect to

---

[4] NECR appears to concede the latter point. *See* Doc. 30 at 15-16 (asserting that rip-rap rocks interfere with "routine maintenance work" and citing Mr. Gordon's testimony that rip-rap rocks intrude upon "a walkway that goes all the way around the backside of the building so we can maintain that area so the debris and anything else doesn't fill in behind there" and so as to address "[t]he snow [that] slides off the roof[] . . . [and] goes down behind there.") (Tr. at 129-131).

17

activities in the garage bay, they are reluctant to do so.[5] They also do not contend that the property presents a unique location for their activities which cannot take place elsewhere. To the contrary, they suggest that NECR should offer to purchase the property to remedy its continuing trespass.

Plaintiffs' contention that "unauthorized interference with a real property interest constitutes irreparable harm as a matter of law," (Doc. 2 at 5) (citing *Brooklyn Heights Ass'n, Inc. v. Nat'l Park Serv.*, 777 F. Supp. 2d 424, 435 (E.D.N.Y. 2011)), does not hold true where the trespass neither extinguishes the property's value, nor prohibits its use entirely. *See, e.g., L.A. Mem. Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) (denying injunctive relief because "a diminution of the market value of plaintiff's property" was a monetary injur[y] which could be remedied by a damage award."); *Hunt v. Bankers Trust Co.*, 646 F. Supp. 59, 64 (N.D. Tex. 1986) (finding no irreparable harm where the "value of the property both with and without [a] proposed zoning change [could] be determined and Movants be fully compensated."). Here, Plaintiffs have not shown that by virtue of NECR's placement of rip-rap rock on a small portion of their property, they have been denied all effective use of the property, sustained irreparable physical damage to it, or have lost the property's entire fair market value. They have therefore failed to establish irreparable harm. This conclusion is underscored by the fact that the damages they allege are readily compensable through a monetary award. *See Faiveley*, 559 F.3d at 118 ("Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances.") (internal quotation marks omitted).

Because Plaintiffs have failed to demonstrate that "there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation[,]" *Kamerling*, 295 F.3d at 214 (internal quotation marks omitted), they have failed to establish irreparable harm.

---

[5] Contrary to NECR's contention, Plaintiffs *do* claim to "be[] exposed to [public health and safety] harms because of the alleged trespass." (Doc. 30 at 14.)

### 4. Whether the Balance of Equities Tips in Plaintiffs' Favor and Whether an Injunction is in the Public Interest.

Even if Plaintiffs could establish irreparable harm and an inadequate remedy at law, the balance of equities favors NECR because Plaintiffs' requested injunction is not in the public interest. *See Winter*, 555 U.S. at 24 (explaining that "[i]n each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.") (internal quotation marks omitted). An order requiring NECR to remove the rip-rap rock may cause NECR to experience substantial costs that may ultimately result in higher expenses for producers who ship their commodities by rail and increased costs for passengers using rail transportation. In contrast, the continued inconvenience to Plaintiffs resulting from the trespass is significantly less substantial.

Balancing the effect of granting or withholding of the requested relief, NECR will be harmed if it is granted, while Plaintiffs may be compensated by an award of money damages, including damages for loss of use and diminution in value, if it is not. *See, e.g., Canton*, 762 A.2d at 809 (affirming "a jury verdict holding [the defendant] liable for changing the natural flow of surface water onto plaintiff['s] . . . property and causing damage in the amount of $27,000."). Because Plaintiffs fail to establish that the "extraordinary remedy" they request is in the public interest and the balance of equities tips in their favor a preliminary injunction is not warranted. *Winter*, 555 U.S. at 24.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction (Doc. 2) is DENIED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 8th day of December, 2017.

Christina Reiss, Chief Judge
United States District Court