U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2019 OCT 10 PM 2: 14**

CLERK

BY _____ [signature]
DEPUTY CLERK

CHARLES GORDON, ALICIA GORDON, )
D.J. ENTERPRISES LLC, )
A.C. LAWN MOWING, )
DENIELLE GORDON, individually and )
doing business as DEN & COMPANY, )
)
Plaintiffs, )
)
v. )
)
NEW ENGLAND CENTRAL )
RAILROAD, INC., )
)
Defendant. )

Case No. 2:17-cv-00154

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Doc. 85)

Plaintiffs Charles, Alicia, and Denielle Gordon (the "Gordons"), D.J. Enterprises

LLC, and A.C. Lawn Mowing (collectively, "Plaintiffs") bring this action against

Defendant New England Central Railroad, Inc. ("Defendant"), alleging that Defendant's

failure to appropriately maintain track facilities caused a railroad embankment adjacent to

the Gordons' land located at 68 Old River Road in Hartford, Vermont (the "Property") to

collapse following a July 1, 2017 rain event. Plaintiffs further allege that Defendant's

efforts to repair the embankment resulted in a trespass on the Property. The First

Amended Complaint ("FAC") asserts the following claims against Defendant: trespass

(Count I); negligence (Count II); unlawful mischief in violation of 13 V.S.A. § 3701

(Count III); and unjust enrichment (Count IV).

Pending before the court is Defendant's January 14, 2019 motion for summary

judgment. (Doc. 85.) On April 26, 2019, Plaintiffs opposed the motion, and on May 26,

2019, Defendant replied. A hearing was held on May 31, 2019, after which the court took the pending motion under advisement.

Plaintiffs are represented by R. Bradford Fawley, Esq., and Timothy C. Doherty, Jr., Esq. Defendant is represented by Mark D. Oettinger, Esq., Michael B. Flynn, Esq., and Matthew M. Cianflone, Esq.

# I. The Factual Record Before the Court.

## A. Whether Defendant's Contested Exhibits Are Admissible.

Plaintiffs object to twenty-eight exhibits cited in support of Defendant's Motion for Summary Judgment.[1] The majority of Plaintiffs' objections fall into three categories: (1) the exhibit is irrelevant to the extent that it addresses Plaintiffs' trespass claim because the court has already found Defendant liable for trespass; (2) the exhibit is not authenticated; or (3) the exhibit contains inadmissible hearsay. Defendant responds that Plaintiffs' objections are premature and that all of its evidence will be admissible at trial when presented in the proper format.

At the summary judgment stage, a party can support a factual assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials[.]" Fed. R. Civ. P. 56(c)(1)(A). While the content of the evidence submitted to support or dispute a fact must be admissible, "the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (internal quotation marks omitted).[2] Rule 56(c)

---

[1] Plaintiffs withdrew their objections to Exhibits 8 and 11. They also conditionally withdrew their objection to Exhibit 17, which appears to be a slide with a photograph of tracks hanging in the air, "[i]f [the tracks depicted] are the tracks near the Plaintiffs' property[.]" (Doc. 127 at 6, ¶ G.) Plaintiffs' objection to Exhibit 23 is mooted by the court's August 28, 2019 Order and Opinion excluding proposed expert witness Harvey Stone's testimony in its entirety. (Doc. 147.)

[2] *See also Fraternal Order of Police, Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (holding that a "proponent need only 'explain the admissible form that is anticipated'") (quoting Fed. R. Civ. P. 56, advisory committee's note to 2010 amendment); *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 538 (4th Cir. 2015) (noting that

of the Federal Rules of Civil Procedure affords the opposing party the opportunity to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). "The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." *Id.*, advisory committee's note to 2010 amendment.

The sole basis for Plaintiffs' objections to nineteen of Defendant's exhibits is that "to the extent [the exhibit] is aimed at establishing a defense to Plaintiffs' trespass claim it is irrelevant because the court has already found [Defendant] liable for trespass. Irrelevant evidence is not admissible." (Doc. 118 ¶¶ 2, 5, 7, 10-14, 16, 18-20, 22-27, 29.) (citing Fed. R. Evid. 402) In response, Defendant asserts that "no response is required" to Plaintiffs' "blanket objections" because the "trespass claim . . . has been decided by the [c]ourt." (Doc. 125 at 3.) Plaintiffs understandably interpret this as a "concession[.]" (Doc. 127 at 2.) The court agrees. To the extent Defendant's exhibits pertain only to Plaintiffs' trespass claim, they will be disregarded.

Of the nine remaining disputed exhibits, Plaintiffs object to seven exhibits because of a lack of authentication. "The bar for authentication of evidence is not particularly high." *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007) (citation omitted). It "'is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Id.* (quoting Fed. R. Evid. 901(a)). "The testimony of a witness with knowledge that a matter is what it is claimed to be is sufficient to satisfy this standard." *Id.* (citing Fed. R. Evid. 901(b)(1)). In response to Plaintiffs' objections, Defendant identified either the creator of each exhibit or a person with knowledge of the document's creation who will properly authenticate the document at trial. Because

---

a court may consider "the content or substance of otherwise inadmissible materials where the party submitting the evidence show[s] that it will be possible to put the information . . . into an admissible form.") (alteration in original) (internal quotation marks omitted); *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-94 (11th Cir. 2012) (determining that a district court may consider a statement "if the statement could be reduced to admissible evidence at trial or reduced to admissible form.") (internal quotation marks omitted).

Defendant proffered sufficient evidence for authentication of Exhibits 2, 5, 6, 10, 19, 30, and 32, the court will not exclude them on that basis. Plaintiffs, however, further object to these same exhibits, as well as Exhibit 35, on the ground that they contain inadmissible hearsay. Defendant responds that the exhibits will be admissible at trial pursuant to a hearsay exception or through live witness testimony.

Exhibit 2 is a July 24, 2017 letter from Governor Phil Scott to President Donald Trump seeking a Presidential Disaster Declaration as a result of the July 1, 2017 rain event. It consists of a four-page letter accompanied by a four-page "Request For Presidential Disaster Declaration Major Disaster Or Emergency" form supported by a seven-page enclosure containing various spreadsheets of damage estimates. While portions of the document may fall within the public records exception, Fed. R. Evid. 803(8), the court cannot conclude that its entire contents are admissible and relevant. The court thus considers Exhibit 2 only for the fact that the State of Vermont made a request for a Presidential Disaster Declaration related to the July 1, 2017 rain event.

Exhibit 5 is a twenty-slide presentation entitled "New England Central Railroad Mainline [W]ashout 1 July 2017." It contains statements regarding and photographs of the damage to Defendant's railroad. The document itself appears to fall within the business records exception, Fed. R. Evid. 803(6), and Defendant asserts that its employees could "provid[e] whatever evidentiary foundation is needed for final admission[.]" (Doc. 125 at 4.) Exhibit 5 is therefore properly before the court.

Exhibit 6 is a FEMA Preliminary Damage Assessment Report summarizing the estimated costs of public assistance to address damage in Vermont caused by the July 1, 2017 rain event. Because the document appears to be a public record admissible under Fed. R. Evid. 803(8), it is properly before the court although its entire contents do not appear to be relevant. The court considers the document solely for the fact that a FEMA Preliminary Damage Assessment was rendered.

Exhibit 19 is a map labelled "Storm Event – Summary of Trackrow Damage" with captioned photographs of railroad tracks superimposed over a map of the Hartford, Vermont area. Defendant represents that its employee, David Cuthbertson, gave sworn

testimony in his deposition that he created the document on or about July 3, 2017 and Defendant offers the document in conjunction with Mr. Cuthbertson's testimony. Exhibit 19 is therefore admissible.

Exhibit 30 is a "Digital Track Notebook Defect Report." This document is a business record under Fed. R. Evid. 803(6) provided Defendant can lay a proper foundation for it at trial and is therefore admissible.

Exhibit 32 is a November 28, 2017 letter from John T. Seguin, Assistant Chief Counsel for Safety at the Federal Railroad Administration ("FRA"), to attorneys at the law firm of Steptoe & Johnson LLP providing the FRA's opinion on the proper interpretation of 49 C.F.R. § 213.33. Defendant represents that this document is not offered to prove the truth of its contents but to "provid[e] guidance as to the meaning and/or interpretation" of regulatory language. (Doc. 125 at 8.) Evidence that would "communicat[e] a legal standard[, whether] explicit or implicit[,]" is not admissible. *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992); *see also Mola Dev. Corp. v. United States*, 516 F.3d 1370, 1379 n.6 (Fed. Cir. 2008) (affidavit of former government official proffering interpretation of regulation deserved no weight because interpretation is an issue of law). The court will therefore disregard Exhibit 32.

Exhibit 33 is a January 2017 Track and Rail and Infrastructure Integrity Compliance Manual from the FRA's Office of Railroad Safety. Plaintiffs object to its admission on the ground that it contains legal opinions as well as a specific disclaimer that "[i]ndented paragraphs are not to be construed as regulatory language in any manner." (Doc. 85-33 at 5.) Defendant responds that the document is offered to provide guidance as to the meaning or interpretation of regulatory language. Because evidence that communicates a legal standard or regulatory interpretation is inadmissible, the court will disregard Exhibit 33. *See Hygh*, 961 F.2d at 364.

Exhibit 35 is a July 2, 2017 report entitled "Structural Assessment of Building Damage[,] 68 Old River Road, White River Jct., VT" prepared by Professional Engineer Timothy L. Schaal and provided to the Gordons opining that "[g]iven the structural condition of the building and the on-going work on the railroad embankment, the western

garage/maintenance bays and the hair salon and apartment above are not safe to occupy."
(Doc. 85-35 at 3.) As this document reflects testimony that may be provided at trial, it is
properly before the court.

## B. The Undisputed Facts.

Plaintiffs Charles and Alicia Gordon purchased the Property located at 68 Old
River Road in Hartford, Vermont for $150,000 in 2009. Three buildings are situated on
the Property: (1) a 1,120-square-foot, three-bay garage; (2) a 1,500-square-foot, five-bay
garage; and (3) a 6,492-square-foot mixed-use building. Prior to July 2017, the mixed-
use building contained garage bays, warehouse storage space, a residential apartment, and
commercial space that served as a day-care center and a beauty salon. The Property was
used for the Gordons' three businesses: A.C. Lawn Mowing, a lawn and snow removal
service; D.J. Enterprises LLC, an entity that leased storage space; and Den & Company,
the beauty salon.

The Property is adjacent to Defendant's mainline railroad tracks, located near the
VA Cut-Off Road at railroad Mile Post 16.23. The railroad's right-of-way and a building
that houses R.H. Scales Co., a seller and distributor of automotive and machine parts, are
both located directly above the Property. Defendant's railroad tracks run north-south
from the Canadian border through St. Albans, Montpelier, White River Junction, and
Brattleboro, Vermont. The section of the tracks that runs adjacent to the Property is
known as the "Roxbury Subdivision."

Defendant's right-of-way includes three culverts: a culvert at approximately Mile
Post 16.23, a drop inlet culvert located at Mile Post 16.28 (the "Drop Inlet Culvert"), and
a box culvert at Mile Post 16.32. The opening of the Drop Inlet Culvert was covered by a
metal plate on July 1, 2017. On or about March 8, 2016, Defendant's employee,
Jonathan Allbee, completed an inspection of the Drop Inlet Culvert, noting that the "Drop
Inlet out in driveway [h]as [a] [s]olid [c]over[.]" (Doc. 85-27 at 3.) Prior to July 1, 2017,
the Gordons did not complain to Defendant about the Drop Inlet Culvert.

On July 1, 2017, more than four inches of rain fell in a twelve-hour period in
Hartford, Vermont, damaging both the Property and Defendant's railroad tracks. The

6

railroad embankment directly above the Property collapsed, causing rocks and debris to enter and damage the mixed-use building on the Property. The railroad tracks and right-of-way were flooded, leaving the railroad tracks suspended in the air.

Defendant sent its employees and a contractor to assess the damage to its tracks, right-of-way, and embankment. Within one day of the July 1, 2017 rain event, Defendant and its contractors began to rebuild the collapsed embankment above the Property. As part of this work, they placed riprap rocks on the damaged areas of the right-of-way and embankment, including at the "toe of the slope" located at the embankment's footing. The riprap rocks provided additional support for track stabilization by reinforcing the slope of the embankment. In the course of Defendant's rebuilding of the embankment, Defendant placed riprap rocks on the Property. In December 2018, Defendant removed the riprap rocks from the Property at its own expense.

## C. The Disputed Facts.

The parties dispute the appropriate characterization of the July 1, 2017 rain event. Defendant refers to it as a "historic rain event" or a "natural disaster[.]" (Doc. 117-1 at 12.) In contrast, Plaintiffs characterize it as a "typical rain event" that produced a reasonably expected water flow; they nonetheless concede that it was a "[fifty] year rainfall event." *Id.* at 13-14.

Defendant asserts that before placing the riprap rocks on the Property, it consulted its valuation maps to determine the boundary line between Defendant's right-of-way and the Property. Defendant's employees believed that a stone wall depicted on the valuation maps indicated the boundary. R.T. Boucher, a former chief engineer of Defendant, testified that Defendant rebuilt the slope of the embankment as close as possible to its location prior to the July 1, 2017 rain event. As a result, Defendant contends its employees believed they were placing the riprap rocks on Defendant's property. Defendant admits that it later discovered that a mistake was made in determining the boundary's location.

7

Plaintiffs assert that Mr. Boucher ignored instructions from David Cuthbertson, Assistant Vice President of Engineering at Genesee & Wyoming Railroad Services, Inc.,[3] regarding how to determine the location of the boundary before placing riprap rocks adjacent to the stone wall on the Property. Mr. Cuthbertson advised that the stone wall "wasn't a reference point that we used to dimension the property line." (Doc. 117-1 at 6, ¶ C-5.) They point out that Mr. Boucher previously testified: "If we were to remove the rock back to the property line, it would allow for . . . that embankment to slide down." (Doc. 117 at 22) (citing C-8). Plaintiffs allege that Defendant knew the location of the boundary but ignored it because the stone wall provided support for the toe of the slope and because building a retaining wall on Defendant's property was "more expensive than what [Defendant] chose to do." *Id.* at 23 (citing C-11). According to Plaintiffs, the collapse of the embankment "buried much of one of their mixed commercial/residential buildings with mud and debris" which "resulted in over 50% of the building being condemned by Town of Hartford officials[.]" *Id.* at 19 (citing B-19). The day after the embankment failure, Mr. Gordon asked Mr. Cuthbertson what he was going to do about the mud, rocks, and debris that had been deposited on the Property. Mr. Cuthbertson allegedly responded: "when the rocks, mud and debris is on [Defendant's] property that is our problem, but when it is on your [P]roperty, that is your problem[.]" *Id.* at 31 (citing B-21).

Defendant contends that the riprap rocks were placed on the embankment in part to "reduce and control the natural flow of water down the slope leading to Plaintiffs' [P]roperty." (Doc. 85 at 7.) Plaintiffs dispute both that this consideration influenced the placement of the riprap rocks as well as Defendant's representation that the riprap rocks were effective in reducing the flow of water down the embankment.

Defendant states that prior to July 1, 2017, the embankment had not collapsed. Plaintiffs counter that during rain events prior to July 1, 2017 the embankment collapsed

---

[3] Genesee & Wyoming Railroad Services, Inc. is a subsidiary of Defendant's parent company, Genesee & Wyoming, Inc.

and eroded in certain places, prompting Plaintiffs to raise concerns regarding the embankment with Defendant.

Defendant claims that the metal plate covering the Drop Inlet Culvert was elevated with gravel on either side of it, allowing water to drain under the plate and enter the culvert. According to Defendant, the Drop Inlet Culvert was monitored during inspections and was not "identified as a problem or defect that needed to be corrected." (Doc. 85 at 12.) Prior to July 1, 2017, flooding or stagnant water around the Drop Inlet Culvert was not observed. Plaintiffs dispute these facts, claiming that the metal plate obstructed the flow of water into the Drop Inlet Culvert. They assert that because the water from the July 1, 2017 rain event could not drain, it backed up and saturated the embankment causing it to fail. Plaintiffs note that approximately an hour after the conclusion of the July 1, 2017 rain event, there was standing water pooled over the Drop Inlet Culvert. Plaintiffs also note that Mr. Allbee testified he observed that water "would build up when it came up high and go under [the cover of the Drop Inlet Culvert]." (Doc. 117-7 at 6.) When asked if the metal plate "constitute[d] an obstruction to th[e] drainage facility" in the Drop Inlet Culvert, Mr. Allbee responded in the affirmative. *Id.* After the July 1, 2017 rain event, the metal plate was removed from the Drop Inlet Culvert and replaced with a perforated drop inlet cover.

## II. Conclusions of Law and Analysis.

### A. Summary Judgment Standard.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' . . . if it 'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). The court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s]

all reasonable inferences in his favor." *McElwee v. Cty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Moreover, not all disputes of fact are material— "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

"The function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (internal quotation marks omitted).

In this case, many of the relevant facts are disputed. However, regardless of those factual disputes, certain claims must be dismissed because they are preempted. Other claims, such as Plaintiffs' punitive damages claim and Denielle Gordon's damages claim, may be dismissed because even crediting Plaintiffs' version of the facts, Plaintiffs cannot establish the essential elements of those claims as a matter of law. *See Anderson*, 477 U.S. at 248-49 (observing that a material fact is one "that might affect the outcome of the

suit under the governing law" and "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.").

## B. Whether Plaintiffs' Claims Are Preempted.

Defendant contends that all of Plaintiffs' claims are preempted by the Interstate Commerce Commission Termination Act (the "ICCTA"), 49 U.S.C. §§ 10101-11908, which purportedly vests the Surface Transportation Board ("STB") with exclusive jurisdiction over them.[4] The applicable preemption framework is set forth at length in the court's December 8, 2017 Opinion and Order Denying Plaintiffs' Motion for a Preliminary Injunction (the "December 8, 2017 Opinion"). Accordingly, the court adopts that framework herein.

Under the Supremacy Clause of the United States Constitution, "[w]here a state statute conflicts with, or frustrates, federal law, the former must give way." *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993) (citing U.S. CONST., Art. VI, cl. 2). Express preemption occurs when "[w]hen Congress has considered the issue of pre-

---

[4] Defendant appears to renew its argument that Plaintiffs' trespass claim is preempted. In its December 8, 2017 Opinion, the court ruled that Plaintiffs' trespass claim (Count I of the FAC) is not preempted. It granted Plaintiffs' motion for partial summary judgment on their trespass claim on November 6, 2018 (Doc. 7). None of the cases Defendant cites in its motion seeking to revisit Plaintiffs' trespass claim involves a railroad placing objects on another party's property which were ultimately removed without any disruption of railroad transportation. In this respect, *Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141 (8th Cir. 2015), Defendant's closest case, is distinguishable. There, the Court of Appeals for the Eighth Circuit found a trespass claim was preempted because the trespass in question was caused by the railroad's elevating an embankment on its own property consistent with applicable standards, resulting in the "rapid flow of water [that] washed away the fertile soil on the Tubbses' farm." *Id.* at 1143. The court pointed out that "this case deals with the structural standards applicable to an earthen embankment on which a railroad runs, standards that would have a significant impact on the construction and maintenance of a rail line." *Id.* at 1146. In contrast, Defendant does not claim any interruption of its operations as a result of the removal of riprap rocks it placed on Plaintiffs' property nor does it rely on any standards that required their placement there. Defendant thus proffers no persuasive argument warranting redetermination of Plaintiffs' trespass claim. *See Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) ("The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'"); *Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 378 (S.D.N.Y. 2009), *aff'd*, 374 F. App'x 71 (2d Cir. 2010) (stating that a trial court's decision "remains the law of the case" unless reversed on appeal).

emption and has included in the enacted legislation a provision explicitly addressing that issue[.]" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992). Implied preemption may "be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." *Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 101 (2d Cir. 2009) (internal quotation marks omitted). "[T]he party asserting that federal law preempts state law bears the burden of establishing preemption." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 96 (2d Cir. 2013) (citing *Wyeth v. Levine*, 555 U.S. 555, 569 (2009)).

"If the statute contains an express pre-emption clause, the task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Easterwood*, 507 U.S. at 664; *see also Island Park, LLC*, 559 F.3d at 101 ("Congressional intent 'primarily is discerned from the language of the pre-emption statute and the statutory framework surrounding it.'") (quoting *Green Mountain R.R. Corp. v. Vermont*, 404 F.3d 638, 641 (2d Cir. 2005)). However, even "[i]f a federal law contains an express pre-emption clause, it does not immediately end the inquiry because the question of the substance and scope of Congress' displacement of state law still remains." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). As one Circuit Court of Appeals has observed, "the presumption against preemption is applicable to 'areas of law traditionally reserved to the states, like police powers and property law[.]'" *Franks Inv. Co. LLC v. Union Pac. R.R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010) (quoting *Davis v. Davis (In re Davis)*, 170 F.3d 475, 481 (5th Cir. 1999) (en banc)); *see also Island Park*, 559 F.3d at 101 ("Indeed, when courts are called upon to address questions of express or implied pre-emption, the analysis always begins with the assumption that the historic police powers of the States are not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.") (internal quotation marks and alterations omitted).

Passed by Congress in 1996, the ICCTA abolished the Interstate Commerce Commission and replaced it with the STB, aiming to prevent "the balkanization and

subversion" of nationwide railway regulations. *Island Park, LLC*, 559 F.3d at 102

(quoting *Iowa, Chi. & E. R.R. Corp. v. Wash. Cty.*, 384 F.3d 557, 559 (8th Cir. 2004)).

To further this intent, the ICCTA contains the following preemption clause:

> The jurisdiction of the Board over—
>
>> (1) transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and
>>
>> (2) the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,
>
> is exclusive. **Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.**

49 U.S.C. § 10501(b) (emphasis supplied). Under the ICCTA, "transportation" is defined as:

> (A) a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and
>
> (B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property[.]

49 U.S.C. § 10102(9).

In *Island Park*, the Second Circuit examined the scope of ICCTA preemption in response to a plaintiff's request for a federal court order enjoining a state court order closing a private railroad crossing. The court held that the "ICCTA preempts all state laws that may reasonably be said to have the effect of managing or governing rail transportation, while permitting the continued application of laws having a more remote or incidental effect on rail transportation." *Island Park*, 559 F.3d at 102 (internal quotation marks omitted). Applying a preemption inquiry that "focuses on the degree to which the challenged regulation burdens rail transportation," the Second Circuit found

that preemption was not warranted because the closure of the crossing did not burden rail transportation "by removing a potential hazard" but rather facilitated it. *Id.* at 103-04 (internal quotation marks, citation, and footnote omitted). Accordingly, notwithstanding the ICCTA's express preemption clause, further analysis is required to determine if Plaintiffs' state-law claims are preempted.

## 1. Whether Plaintiffs' Unlawful Mischief Claim Is Preempted.

In their unlawful mischief claim (Count III of the FAC), Plaintiffs allege that Defendant intentionally damaged the Property by placing riprap rocks on it in violation of 13 V.S.A. § 3701(c). *See* Doc. 117 at 20 (stating that "the Gordons sued under § 3701(c), not (d)"). Section § 3701 provides:

(a) A person who, with intent to damage property, and having no right to do so or any reasonable ground to believe that he or she has such a right, does any damage to any property which is valued in an amount exceeding $1,000.00 shall be imprisoned for not more than five years or fined not more than $5,000.00, or both.

(b) A person who, with intent to damage property, and having no right to do so or any reasonable ground to believe that he or she has such a right, does any damage to any property which is valued in an amount exceeding $250.00 shall be imprisoned for not more than one year or fined not more than $1,000.00, or both.

(c) A person who, having no right to do so or any reasonable ground to believe that he or she such a right, intentionally does any damage to property of any value not exceeding $250.00 shall be imprisoned for not more than six months or fined not more than $500.00, or both.

(d) A person who, with intent to damage property, and having no right to do so or any reasonable ground to believe that he or she has such a right, does any damage to any property by means of an explosive shall be imprisoned for not more than five years or fined not more than $5,000.00, or both.

(e) For the purposes of this section "property" means real or personal property.

(f) A person who suffers damages as a result of a violation of this section may recover those damages together with reasonable attorney's fees in a civil action under this section.

13 V.S.A. § 3701.

The Vermont Supreme Court has ruled that the references to value in 13 V.S.A. § 3701 "apply[] to 'the amount of damage inflicted . . . as opposed to the value of the property damaged.'" *Evans v. Cote*, 2014 VT 104, ¶ 15 n.4, 197 Vt. 523, 531, 107 A.3d 911, 917 (quoting *State v. Breznick*, 356 A.2d 540, 543 (Vt. 1976)). Although Plaintiffs cite § 3701(c) as the basis for their unlawful mischief claim and although the value of the damage to the Property has not been determined, it substantially exceeds $250.00. The court thus assumes Plaintiffs cited § 3701(c) in error. Section 3701(a) imposes liability if a person, "with intent to damage property, and having no right to do so or any reasonable ground to believe that he or she has such a right, does any damage to any property which is valued in an amount exceeding $1,000.00[.]" 13 V.S.A. § 3701(a). Assuming Plaintiffs intended to cite this subsection, they must establish that Defendant acted "with intent to damage [Plaintiffs'] property[]" and had no "reasonable ground" to believe that it had a right to do so. *Id.*

Because an unlawful mischief claim does not necessarily have "the effect of managing or governing rail transportation," it is not expressly preempted by the ICCTA. *See Island Park, LLC*, 559 F.3d at 102. Plaintiffs' unlawful mischief claim must therefore be examined under the STB's two-prong "as-applied" test for "implied preemption under the ICCTA." *Franks*, 593 F.3d at 414 (footnote omitted). This test analyzes first whether the law is "unreasonably burdensome," and second, whether the law "discriminate[s] against railroads." *N.Y. Susquehanna & W. Ry. Corp. v. Jackson*, 500 F.3d 238, 253 (3d Cir. 2007); *see also Green Mountain R.R.*, 404 F.3d at 643. If a law fails either prong of the test, it is preempted by the ICCTA. *N.Y. Susquehanna & W. Ry. Corp.*, 500 F.3d at 253. "Thus, for a state regulation to pass muster, it must address state concerns generally, without targeting the railroad industry" to satisfy the neutrality prong, and "[a]s for the unreasonably burdensome prong, . . . the regulation must not . . . prevent[] the railroad from carrying out its business in a sensible fashion." *Id.* at 254.

Vermont's unlawful mischief statute is a neutral law that does not "require something of [Defendant] that it does not require of similarly situated entities." *Adrian &*

*Blissfield R.R. Co. v. Vill. of Blissfield*, 550 F.3d 533, 541-42 (6th Cir. 2008).[5] It thus passes the first prong of the STB's as-applied test. *See id.* at 542 (finding a state law did not discriminate where it "addresse[d] a general state concern" and imposed no special requirement on railroad). However, adjudicating the motive underpinning a railroad's decision to repair a failed embankment and deciding whether the railroad reasonably believed it had a right to do so would "interfere with [the railroad's] ability to uniformly design, construct, maintain and repair its railroad line[,]" *Tubbs v. Surface Transp. Bd.*, 812 F.3d 1141, 1146 (8th Cir. 2015), and for that reason, "state tort claims . . . that involve second-guessing of decisions made by railroads" are preempted by the ICCTA. *Griffioen v. Cedar Rapids & Iowa City Ry. Co.*, 914 N.W.2d 273, 277 (Iowa 2018). To allow such a claim to proceed would subject a railroad to unpredictable, piecemeal state regulation with little to no guidance as to which repairs are permissible and which are not. *See Green Mountain R.R.*, 404 F.3d at 643 (finding state law preempted where the "requirements [of the law] are not set forth in any schedule or regulation that the railroad can consult in order to assure compliance"). To avoid ICCTA preemption, state laws "must be clear enough that the rail carrier can follow them and . . . the state cannot easily use them as a pretext for interfering with or curtailing rail service." *N.Y. Susquehanna & W. Ry. Corp.*, 500 F.3d at 254. Vermont's unlawful mischief statute does not provide the requisite guidance.

Because Plaintiffs' claim for unlawful mischief under Vermont law fails the second prong of the STB's as-applied test, it is preempted by the ICCTA. Defendant's motion for summary judgment on Count III of the FAC is therefore GRANTED.

### 2. Whether Plaintiffs' Unjust Enrichment Claim Is Preempted.

In Count IV of the FAC, Plaintiffs assert a claim of unjust enrichment, alleging that Defendant placed riprap rocks on the Property to repair the embankment instead of

---

[5] Defendant's argument that § 3701 "discriminat[es] against railroads as Plaintiffs are, for all intents and purposes, seeking to punish [Defendant] for how it conducted its rail operations and managed its right-of-way and drainage facilities" (Doc. 85 at 17 n.4) is misplaced. The first prong of the as-applied test focuses on the language and effect of the statute in question, not on an opposing party's motive in seeking its enforcement.

constructing a more expensive support structure on Defendant's own property, resulting in an economic benefit to Defendant that it would be unjust for Defendant to retain. Unjust enrichment requires a party without an adequate remedy at law to prove: "'(1) a benefit was conferred on defendant; (2) defendant accepted the benefit; and (3) defendant retained the benefit under such circumstances that it would be inequitable for defendant not to compensate plaintiff for its value.'" *Kellogg v. Shushereba*, 2013 VT 76, ¶ 31, 194 Vt. 446, 463, 82 A.3d 1121, 1133 (quoting *Center v. Mad River Corp.*, 561 A.2d 90, 93 (Vt. 1989)); *JW, LLC v. Ayer*, 2014 VT 71, ¶ 22, 197 Vt. 118, 129, 101 A.3d 906, 914 (observing that unjust enrichment may be awarded in equity where "'the law implies a promise to pay [because] a party receives a benefit and the retention of the benefit would be inequitable.'") (alteration in original) (quoting *Cedric Electric, Inc. v. Shea*, 472 A.2d 757, 757 (Vt. 1984) (per curiam)). "Unjust enrichment applies if, 'in light of the totality of the circumstances, equity and good conscience demand' that the benefitted party return that which was given." *Kellogg*, 2013 VT 76, at ¶ 22, 194 Vt. at 458, 82 A.3d at 1130 (quoting *Gallipo v. City of Rutland*, 2005 VT 83, ¶ 41, 178 Vt. 244, 263, 882 A.2d 1177, 1191).

Unjust enrichment is not expressly preempted by the ICCTA because it is a doctrine that does not necessarily have the effect of managing or governing rail transportation. *Island Park*, 559 F.2d at 102-03. It passes the neutrality prong of the STB's as-applied test because it does not discriminate against railroads. *See Adrian*, 550 F.3d at 542. However, an unjust enrichment claim fails the second prong of the as-applied test because it requires the weighing of competing equities, including scrutiny of the economic rationale for Defendant's decisions and a determination of whether "equity and good conscience demand" that Defendant return any benefit conferred. *Kellogg*, 2013 VT 76, at ¶ 22, 194 Vt. at 458, 82 A.3d at 1130 (internal quotation marks omitted). In this respect, it involves the same impermissible "second-guessing of decisions made by railroads[,]" *Griffioen*, 914 N.W.2d at 277, as Plaintiffs' unlawful mischief claim. *See Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 807 (5th Cir. 2011) (finding state statutory and tort claims that "attempt[ed] to manage [railroad's] decisions in the economic realm"

17

were preempted by the ICCTA); *Ezell v. Kansas City S. Ry. Co.*, 866 F.3d 294, 299-300 (5th Cir. 2017) (same). It also fails to provide sufficient guidance to railroads that seek to avoid its application. *See Green Mountain R.R.*, 404 F.3d at 643; *see also Jones Creek Investors, LLC v. Columbia Cty., Ga.*, 98 F. Supp. 3d 1279, 1294 (S.D. Ga. 2015) (finding preemption of state-law tort claims based on railroad's efforts to prevent embankment erosion which were "integral and necessary repair[s] to the railway infrastructure"); *Pejepscot Indus. Park, Inc. v. Maine Cent. R.R. Co.*, 297 F. Supp. 2d 326, 333-34 (D. Me. 2003) (holding state-law tortious interference claim was preempted by the ICCTA because awarding damages "may serve to impermissibly regulate rail transportation").

Because Plaintiffs' unjust enrichment claim is preempted by the ICCTA, the court does not address whether Plaintiffs have an adequate remedy at law which defeats the court's equitable jurisdiction. *See Gerety v. Poitras*, 224 A.2d 919, 920 (Vt. 1966) (holding that if a claimant has an adequate remedy at law "and the main cause of action is of a legal nature, equity has no jurisdiction."). Accordingly, Defendant's motion for summary judgment as to Plaintiffs' unjust enrichment claim set forth in Count IV is GRANTED.

### 3. Whether Plaintiffs' FRSA Negligence Claim Is Preempted.

In Count II of the FAC, Plaintiffs allege that Defendant was negligent in failing to maintain its track in accordance with federal safety standards promulgated under the Federal Railway Safety Act ("FRSA"), 49 U.S.C. §§ 20101-21311, causing damage to the Property. The FRSA mandates that the Secretary of Transportation prescribe regulations "for every area of railroad safety[.]" 49 U.S.C. § 20103(a). The court agrees with Defendant that negligence claims are often preempted by the ICCTA. *See, e.g., Friberg v. Kansas City S. Ry. Co.*, 267 F.3d 439, 444 (5th Cir. 2001) (finding ICCTA preemption extends to state common-law claims of negligence and negligence *per se* based on railroad's operational decisions); *Pace v. CSX Transp., Inc.*, 613 F.3d 1066, 1070 (11th Cir. 2010) (finding state-law nuisance claim preempted "where that liability

arises from a railroad's economic decisions"). However, there is an exception to this general rule that is explicitly authorized by the FRSA.[6]

Plaintiffs allege Defendant violated FRSA regulations which "prescribe[] minimum safety requirements for railroad track[.]" 49 C.F.R. § 213.1. More specifically, they allege a violation of 49 C.F.R. § 213.33, which states: "Each drainage or other water carrying facility under or immediately adjacent to the roadbed shall be maintained and kept free of obstruction, to accommodate expected water flow for the area concerned." *See MD Mall Assocs., LLC v. CSX Transp., Inc.*, 715 F.3d 479, 492 (3d Cir. 2013) (observing that § 213.33 "plainly intended to prevent water from pooling on or around railroad tracks and thus to avoid potentially dangerous conditions occasioned by standing water, such as the presence of debris on tracks[] . . . and compromised track integrity.").

"Unlike the ICCTA, which concerns regulation over the economic and operational aspects of railroads, the FRSA . . . was enacted to *promote safety* in every area of railroad operations and reduce railroad-related accidents and incidents." *Waubay Lake Farmers Ass'n v. BNSF Ry. Co.*, 2014 WL 4287086, at *8 (D.S.D. Aug. 28, 2014) (emphasis in original) (internal quotation marks omitted). The preemptive effect of the FRSA is governed by 49 U.S.C. § 20106, which states: "[l]aws, regulations, and orders related to railroad safety and laws, regulations, and orders related to railroad security shall be nationally uniform to the extent practicable."

In 2007, Congress amended the FRSA's preemption clause, clarifying that the FRSA does not "preempt an action under State law seeking damages for personal injury,

---

[6] Defendant argues that Plaintiffs' negligence claim is preempted by the ICCTA. However, because the FRSA provides the applicable preemption clause, Defendant's reliance on ICCTA preemption is misplaced. *See Island Park, LLC v. CSX Transp.*, 559 F.3d 96, 101 (2d Cir. 2009) ("[The] FRSA provides the appropriate basis for analyzing whether a state law, regulation or order affecting rail safety is pre-empted by federal law."); *Tyrrell v. Norfolk S. Ry. Co.*, 248 F.3d 517, 524 (6th Cir. 2001) (holding that where a regulation has a "connection with rail safety . . . [the] FRSA provides the applicable standard for assessing federal preemption"); *Smith v. CSX Transp., Inc.*, 2014 WL 3732622, at *2 (N.D. Ohio July 25, 2014) (holding that because plaintiffs' allegations "involve railroad safety procedures, which the FRSA—not the ICCTA— was enacted to regulate[,] . . . the ICCTA does not preempt [p]laintiffs' claims").

19

death, or property damage" based on a claim that a railroad has "failed to comply with the Federal standard of care established by a regulation or order . . . ; has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order . . .; or has failed to comply with a State law, regulation, or order that is not incompatible with [49 U.S.C. § 20106(a)(2)]." 49 U.S.C. § 20106(b).[7] Under § 20106(b), Plaintiffs' negligence claim is therefore not preempted by the FRSA. *See Zimmerman v. Norfolk S. Corp.*, 706 F.3d 170, 178 (3d Cir. 2013) (holding that, under the FRSA, if the "defendant allegedly violated either a federal standard of care or an internal rule that was created pursuant to a federal regulation[,] . . . the plaintiff's claim avoids preemption"); *see also In re Union Pac. R.R. Co.*, 2018 WL 6836827, at *3 (Tex. App. Dec. 28, 2018) ("the ICCTA does not expressly preempt negligence claims based on an alleged failure to comply with [FRSA] safety regulations"). Defendant's motion for summary judgment as to Plaintiffs' negligence claim in Count II of the FAC on the grounds that it is preempted is thus DENIED.

## C. Whether Defendant Is Entitled to Summary Judgment for Failure to Establish the Essential Elements of a Negligence Claim.

In the absence of a federal common law of negligence, federal courts sitting in diversity apply state law. *See Spak v. Phillips*, 857 F.3d 458, 461 (2d Cir. 2017) (applying state law to claim for malicious prosecution under 42 U.S.C. § 1983 based on violation of federal statute due to "the absence of federal common law"). Under Vermont law, "[c]ommon law negligence has four elements: a legal duty owed by defendant to plaintiff, a breach of that duty, actual injury to the plaintiff, and a causal link between the breach and the injury." *Demag v. Better Power Equip., Inc.*, 2014 VT 78, ¶ 6, 197 Vt.

---

[7] Many of the cases cited by Defendant either predate 2007, when the FRSA preemption provision was amended, or concern state law tort claims that are not premised on violations of FRSA safety regulations and are therefore subject to the ICCTA's preemption clause. While the court in *Rooney v. City of Philadelphia*, 623 F. Supp. 2d 644, 666 (E.D. Pa. 2009) held that negligence and nuisance claims stemming from a railroad's allegedly improper maintenance of drainage facilities were preempted under the FRSA, that court did not address 49 U.S.C. § 20106(b), and it is unclear whether a violation of an FRSA regulation was the factual and legal linchpin of plaintiffs' common law claims.

176, 179, 102 A.3d 1101, 1105 (quoting *Zukatis v. Perry*, 682 A.2d 964, 966 (Vt. 1996)). "Duty is . . . primarily a question of law." *Endres v. Endres*, 2008 VT 124, ¶ 11, 185 Vt. 63, 68, 968 A.2d 336, 340; *Keegan v. Lemieux Sec. Servs., Inc.*, 2004 VT 97, ¶ 7, 177 Vt. 575, 576, 861 A.2d 1135, 1137 ("[W]hether the law imposed upon defendants a duty of care" is "a determination the trial court must make as a matter of law.").

"[T]he degree of care that a reasonably prudent person would exercise, and thus the scope of the legal duty of ordinary care, is determined by the foreseeability of the consequences of an individual's acts or omissions." *Edson v. Barre Supervisory Union No. 61*, 2007 VT 62, ¶ 10, 182 Vt. 157, 161, 933 A.2d 200, 204; *see also Thompson v. Green Mountain Power Corp.*, 144 A.2d 786, 790 (Vt. 1958) ("Foreseeable consequences may be significant in the determination of the scope of legal duty and whether a duty of care has been violated."). Although establishing the standard of care is generally a matter of law for the court, the foreseeability of the consequences of a defendant's actions is frequently an issue for the jury. *See Demag*, 2014 VT 78, at ¶ 28, 197 Vt. at 188, 102 A.3d at 1111 (plaintiff demonstrated "a question of material fact for the jury regarding the foreseeability" of harm suffered); *see also* Restatement (Third) of Torts: Physical and Emotional Harm § 7, cmt. j (2019) (observing that foreseeability is a question of fact "unless no reasonable person could differ on the matter."). Whether defendant breached its duty is also usually a question for the jury. *Pasternack v. Lab. Corp. of Am. Holdings*, 807 F.3d 14, 19 (2d Cir. 2015) (holding that, in negligence cases, "juries determine whether and to what extent a particular duty was breached").

Defendant contends that because it maintained its tracks in accordance with federal regulations, Plaintiffs cannot establish that Defendant breached a duty as required for Plaintiffs' negligence claim. Specifically, Defendant argues that it maintained drainage facilities in compliance with 49 C.F.R. § 213.33 and that Plaintiffs fail to establish not only the "expected water flow for the area concerned" as required by that regulation but also that Defendant had notice of the drainage issue. Defendant asserts that the July 1, 2017 rain event was a "historic rain event" that created water flow that could not reasonably have been "expected." Additionally, Defendant maintains that the

21

metal plate covering the Drop Inlet Culvert properly allowed for drainage in compliance with 49 C.F.R. § 213.33. Plaintiffs disagree that the July 1, 2017 rain event was unexpected, asserting that it was a fifty-year event and Mr. Cuthbertson stated that culverts are designed to handle one-hundred-year rain events. Plaintiffs further contend that by failing to remove the metal plate covering the Drop Inlet Culvert, Defendant violated 49 C.F.R. § 213.33 and that Defendant had notice of the issue with the Drop Inlet Culvert not only through its employees' observations but through Plaintiffs' complaints. These disputed issues of fact must be resolved by a jury, not the court. *See* Fed. R. Civ. P. 56.

Even if Plaintiffs can establish disputed issues of fact regarding the existence, scope, and breach of Defendant's duty, Defendant argues that summary judgment remains appropriate because Plaintiffs cannot establish causation. *See Ziniti v. New England Cent. R.R.*, 2019 VT 9, ¶ 34, 207 A.3d 463, 473 (finding that even if a plaintiff alleges a breach of duty based on violation of a safety statute, "a facial claim of negligence also requires injury and causation[.]"). Defendant characterizes the July 1, 2017 rain event as an "Act of God[.]" (Doc. 85 at 32.) Plaintiffs, however, dispute that the July 1, 2017 rain event was the sole cause of the damage to the Property and assert the embankment would not have failed had Defendant removed the metal plate over the Drop Inlet Culvert as allegedly required by 49 C.F.R. § 213.33.

The Vermont Supreme Court has explained that not all "acts of God" negate liability:

Where damages suffered are due, directly and exclusively, to natural causes, without human intervention, which could not have been prevented by any amount of foresig[h]t, pains, and care reasonably to be expected, there is no liability, because it is an act of God. But, if the damages are not due exclusively to such natural causes, in other words, if the negligence of the one sought to be charged mingles with the operation of the natural causes, the injury is not, in a legal sense, the act of God. So, if the injury which the flood occasioned might have been avoided or prevented by human prudence, foresight, pains, and care reasonably to be expected from the defendant, but not exercised, there is liability.

*Perkins v. Vt. Hydro-Elec. Corp.*, 177 A. 631, 636 (Vt. 1934) (internal quotation marks omitted). Because it is disputed whether Defendant could have prevented the flooding and erosion that accompanied the July 1, 2017 rain event by removing or replacing the cover of the Drop Inlet Culvert, and because it is further disputed whether the July 1, 2017 rain event was an unprecedented natural event or an anticipated natural event that mingled with Defendant's negligence, Defendant's motion for summary judgment with regard to Plaintiffs' FRSA negligence claim (Count II) must be DENIED. *See Demag*, 2014 VT 78, at ¶ 28, 197 Vt. at 188, 102 A.3d at 1111 (denying summary judgment where "plaintiff has demonstrated sufficient evidence to raise a genuine question of material fact for the jury regarding the foreseeability" of alleged harm).

## D.    Whether Plaintiffs Have Proffered Evidence of Damages Incurred by Denielle Gordon.

Defendant argues that Plaintiffs failed to proffer evidence of damages incurred by Denielle Gordon ("D. Gordon") and therefore cannot establish an essential element of her negligence claim. Defendant observes that Ms. D. Gordon did not timely disclose the value of the items that she lost, despite being asked to do so in interrogatories.[8] At her deposition, Defendant questioned Ms. D. Gordon regarding how she had been damaged. In response, she identified a number of items she had lost in the flood, some of which she replaced. She could not testify as to the replacement costs she incurred, she did not file an insurance claim for the damaged property, and she received money from her father to help her out but did not reveal how much.

Plaintiffs respond that because Ms. D. Gordon was "exhausted" and "her memory faltered" during her deposition, she was unable to specifically recall the value of the

---

[8] Defendant's interrogatories propounded to Ms. D. Gordon asked her to identify the actual replacement and repair costs of any property she alleges was damaged by the July 1, 2017 rain event. In response, she asserted that her property was not repairable and her "document production will include lists of each item of personal property [she could] recall was lost or damaged, including its value." (Doc. 85-36 at 6.) She deferred the amount of her lost earnings to an expert witness disclosure and objected to an interrogatory asking her to: "State in full and complete detail whether you claim to have suffered any financial loss as a result of the alleged accident or incident and, if so, please identify each and every expense and/or loss incurred by you[,]" *id.* at 7, indicating that her response, notwithstanding her objections, was "yes." *Id.*

23

property that she lost. (Doc. 117 at 35-36.) Although Ms. D. Gordon does not have receipts or an inventory of items that were in her salon before the July 1, 2017 rain event, on April 4, 2019, after the close of discovery, she submitted a declaration which included a handwritten list of the cost of the inventory that she lost in connection with the embankment collapse. Plaintiffs therefore assert that Ms. D. Gordon "can list some of [the damaged] property and is competent to provide the jury with a value for her loss." *Id.* at 38.

"[D]amages for negligent acts continue to require proof of actual harm." *City of Burlington v. Arthur J. Gallagher & Co.*, 788 A.2d 18, 22 (Vt. 2001). Pursuant to 12 V.S.A. § 1604, "[t]he owner of real or personal property shall be a competent witness to testify as to the value thereof." The only "proof of harm" Ms. D. Gordon has proffered to date is a declaration attached to Plaintiffs' opposition. Defendant contends that this is a sham declaration that must be disregarded.

"[F]actual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001); *see also Haynes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."). Ms. D. Gordon's declaration contradicts her prior testimony that she could not recall the value of any of the damaged property. It also impermissibly seeks to amend her non-compliant responses to Defendant's interrogatories. Because Ms. D. Gordon failed to proffer admissible evidence of her actual damages, Defendant's motion for summary judgment as to her claim for negligence is GRANTED.

### E. Whether Plaintiffs Can Recover Punitive Damages.

Defendant contends that it is entitled to summary judgment on Plaintiffs' claim for punitive damages because Plaintiffs are unable to show that Defendant acted with malice. "Punitive damages require a showing of essentially two elements. The first is wrongful

conduct that is outrageously reprehensible. . . . The second is malice, defined variously
as bad motive, ill will, personal spite or hatred, reckless disregard, and the like." *Fly Fish
Vt., Inc. v. Chapin Hill Estates, Inc.*, 2010 VT 33, ¶ 18, 187 Vt. 541, 548-49, 996 A.2d
1167, 1173 (citations omitted). "[M]alice may arise from deliberate and outrageous
conduct aimed at securing financial gain or some other advantage at another's expense,
even if the motivation underlying the outrageous conduct is to benefit oneself rather than
harm another." *DeYoung v. Ruggiero*, 2009 VT 9, ¶ 27, 185 Vt. 267, 279, 971 A.2d 627,
636. Where punitive damages are sought against a corporate defendant, the plaintiff must
show that the malicious act was committed by a governing officer of the corporation or, if
the actor was a servant or agent, that a governing officer directed, participated in, or
subsequently ratified the conduct. *Shortle v. Cent. Vt. Pub. Serv. Corp.*, 399 A.2d 517,
518 (Vt. 1979). "Ordinary carelessness" by a company's employees is insufficient to
support an award of punitive damages. *Id.* at 518-19.

   Plaintiffs concede that Defendant's failure to remove or replace the metal plate
from the Drop Inlet Culvert was not malicious. However, they allege that after
Defendant placed riprap rocks on the Property, Defendant's repeated refusal to remove
those rocks demonstrated a "knowing, intentional, and wanton disregard" for Plaintiffs'
property rights. (Doc. 117 at 32.) Plaintiffs further allege that Defendant placed riprap
rocks on the Property in order to save money which they argue constitutes "deliberate and
outrageous conduct aimed at securing financial gain[.]" *DeYoung*, 2009 VT 9, at ¶ 27,
185 Vt. at 279, 971 A.2d at 636.[9] They cite *Teague v. York*, 416 S.E.2d 356 (Ga. Ct.
App. 1992) for the proposition that "[a] wil[l]ful repetition of a trespass gives rise to an
action for punitive damages." *Id.* at 357 (internal quotation marks omitted).

---

[9] *DeYoung*, on which Plaintiffs rely in arguing that seeking financial gain at another's expense
can qualify as malice, is factually inapposite. That case involved an attorney who fraudulently
appropriated funds from the estate of his deceased client and invested them in his own business
instead of distributing the money to the decedent's family, as was his legal and fiduciary
obligation. The court observed that his conduct included both fraud and deceit, neither of which
is present here. *DeYoung v. Ruggiero*, 2009 VT 9, ¶ 23, 185 Vt. 267, 277, 971 A.2d 627, 635.

Under Vermont law, malice is "the character of outrage frequently associated with crime[.]" *Brueckner v. Norwich Univ.*, 730 A.2d 1086, 1095 (Vt. 1999). Even if Defendant acted with haste in pursuit of its own economic advantage at Plaintiffs' expense, there is no evidence that it did so with "ill will, personal spite or hatred, [or] reckless disregard" for Plaintiffs' rights. *J.A. Morrissey, Inc. v. Smejkal*, 2010 VT 66, ¶ 34, 188 Vt. 245, 261, 6 A.3d 701, 713 (citing *Fly Fish Vt., Inc.*, 2010 VT 33, at ¶ 18, 187 Vt. at 549, 996 A.2d at 1173). At the time of the placement of the riprap rocks, Defendant had legitimate concerns regarding the stability of the embankment. The trespass at issue in this case was minimal with limited if any impact on Plaintiffs' use of the Property. Defendant ultimately removed the riprap rocks at its own expense without requiring a court order mandating that outcome even though Plaintiffs sought one. There is no evidence that Plaintiffs suffered any additional damages because Defendant did not remove the riprap rocks immediately. Against this backdrop, no rational jury could make the requisite factual findings for punitive damages.

Because Vermont law "require[s] a showing that defendant[] acted with actual malice before . . . the issue of punitive damages [may] go to a jury," Defendant's motion for summary judgment on Plaintiffs' claim for punitive damages is GRANTED. *Follo v. Florindo*, 2009 VT 11, ¶ 44, 185 Vt. 390, 411, 970 A.2d 1230, 1245; *DeYoung*, 2009 VT 9, ¶ 30, 185 Vt. at 281, 971 A.2d at 637.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED IN PART AND DENIED IN PART. (Doc. 85.) Defendant's motion is GRANTED with respect to Plaintiffs' claims for unlawful mischief and unjust enrichment (Counts III and IV). Defendant's motion for summary judgment as to Ms. D.

Gordon's claim of negligence and Plaintiffs' claim for punitive damages is GRANTED. The motion is DENIED in all other respects.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 10th day of October, 2019.

Christina Reiss, District Judge
United States District Court